UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERYL WARREN,

              Plaintiff,                       CIVIL ACTION NO. 10-11775

              v.                         DISTRICT JUDGE NANCY G. EDMUNDS

CAREN BURDI, MICHAEL LEVINE,       MAGISTRATE JUDGE MARK A. RANDON
STEPHEN VELLA, MICHIGAN
ATTORNEY GRIEVANCE COMMISSION,
GEORGE SHEA, JEFFREY VOLLMER,
ROBERT AGACINSKI, WAYNE WEGNER,
WEGNER AND ASSOCIATES, P.C.,
and SHEA, CREIGHTON, ET AL, P.C.,

              Defendants.

_____/


**REPORT AND RECOMMENDATION TO DENY DEFENDANT LEVINE'S MOTION
FOR A MORE DEFINITE STATEMENT (DKT. 19), TO GRANT DEFENDANTS'
MOTIONS TO DISMISS (DKTS. 25, 29, 32, 48 & 53), TO GRANT DEFENDANTS
WEGNER AND LEVINE'S MOTIONS FOR SANCTIONS (DKTS. 43 & 64)
AND TO DENY DEFENDANT BURDI'S MOTION FOR SANCTIONS (DKT. 47)**

       This is a civil rights action brought under 42 U.S.C. § 1983.  Plaintiff Cheryl Warren

("Plaintiff") is an attorney, currently suspended from the practice of law.  Plaintiff alleges, generally,

that Defendants violated her constitutional rights during the attorney disciplinary proceedings that

led to her suspension from the practice of law and in denying her petition for reinstatement (*See*

Complaint (Dkt. 2)).

       There are several motions presently before the Court: Defendant Michael Levine's Motion

for More Definite Statement (Dkt. 19); Defendants Michigan Attorney Grievance Commission,

Stephen Vella and Robert Agacinski's Motion to Dismiss (Dkt. 25); Defendants George Shea and

Shea Creighton, et. al., P.C.'s Motion To Dismiss (Dkt. 29); Defendants Jeffrey Vollmer, Wayne

Wegner and Wegner and Associates P.C.'s Motion to Dismiss and/or for Summary Judgment and

Motion for Sanctions (Dkts. 32 & 43); Defendant Caren Burdi's Motion to Dismiss and/or for

Summary Disposition (Judgment) and Motion for Sanctions (Dkts. 47 & 48); Defendant Michael

Levine's Motion to Dismiss and Second Motion for Sanctions[1]  (Dkts. 53 & 64).

Although most Defendants titled their dispositive motions as "motions to dismiss," many

present information and evidence outside of the pleadings.  Because the Court will not exclude the

extra-pleading evidence presented, Defendants' motions to dismiss will be construed as motions for

summary judgment, as appropriate.  *See* Fed. R. Civ. P. 12(d).[2]  Plaintiff filed responses to all of the

motions (Dkts. 35, 37, 39, 40, 21, 45, 55, 57, 61, 62 & 66).  Defendants filed various replies (Dkts.

36, 38, 46, 60, 68 & 76) and Plaintiff filed a sur-reply (Dkt. 52).

District Judge Nancy G. Edmunds referred all pre-trial matters to the undersigned (Dkt. 1).

Oral argument on all the motions was held before the undersigned on December 9, 2010.  During

the hearing, Plaintiff was ordered (Dkt. 71) to file a supplemental response to Defendants' Motions

---

[1]  Defendant Michael Levine filed an initial Motion for Sanctions on September 23, 2010 (Dkt. 54), but withdrew it on October 5, 2010 (Dkt. 58).

[2]  A district court construing a motion to dismiss as a motion for summary judgment "should give the parties notice and an opportunity to present all material relevant to a motion for summary judgment." *Northville Downs v. Granholm*, 622 F.3d 579, 585 (6th Cir. 2010).  However, "[t]he district court's failure to give such notice and opportunity to respond is not reversible error ... where all parties in fact had a sufficient opportunity to present pertinent materials." *Id.* at 504 (citation omitted).

Here, despite labeling their motions as motions to dismiss pursuant to Rule 12(b)(6), Defendants explicitly sought summary judgment on some claims and cited the standard for summary judgment in addition to the standard for a motion to dismiss (Dkt. 32, 48, 53).  Plaintiff clearly recognized that she was responding to motions that, at least in part, sought summary judgment (Dkt. 41, p. 8).  Under these circumstances, the parties had notice that the dispositive motions would be subject to a summary judgment determination.

- 2 -

for Sanctions – specifically addressing Defendants' arguments concerning the *Rooker-Feldman* doctrine and immunity – by December 23, 2010, which Plaintiff timely filed (Dkt. 75).

The undersigned, having reviewed Defendants' motions, Plaintiff's responses, Defendants' replies, Plaintiff's sur-reply and Plaintiff's supplemental brief on the issue of sanctions; having considered the presentations made during oral argument, and being otherwise fully advised, hereby **RECOMMENDS** that Defendant Michael Levine's Motion for a More Definite Statement (Dkt. 19) be **DENIED**, as moot, that all Defendants' Motions to Dismiss and/or for Summary Judgment (Dkts. 25, 29, 32, 48 & 53) be **GRANTED**, that Defendants Wegner and Levine's Motions for Sanctions (Dkts. 43 & 64) be **GRANTED** and that Defendant Burdi's Motion for Sanctions (Dkt. 47) be **DENIED**.

## I. BACKGROUND

### A. Facts

#### 1. *The Parties*

As noted earlier, Plaintiff is an attorney, currently suspended from the practice in law in Michigan. Defendant Michigan Attorney Grievance Commission (the "Grievance Commission") is the prosecution arm of the Michigan Supreme Court, responsible for supervising and disciplining Michigan attorneys. *See* MCR 9.108(A). Defendant Robert Agacinski ("Agacinski") is the Grievance Commission's administrator; Agacinski is appointed by the Michigan Supreme Court, and is authorized to prosecute complaints the Grievance Commission authorizes. *See* MCR 9.109(B). Defendant Stephen Vella ("Vella") is one of the Grievance Commission's staff attorneys. Plaintiff's claims arise out of a complaint against her for attorney misconduct that was authorized by the Grievance Commission, filed by Agacinski and prosecuted by Vella. Plaintiff alleges, *inter alia*, that

- 3 -

Vella "framed" her by presenting perjured testimony at Plaintiff's grievance hearing, and did so because Plaintiff is a woman.

Defendant Michael Levine ("Levine") is a former client of Plaintiff. Plaintiff's representation of Levine gave rise to the underlying attorney disciplinary proceedings against Plaintiff.

Defendants George Shea and the law firm of Creighton, McLean & Shea, P.L.C., (collectively, "Defendants Shea") represented Levine after his attorney/client relationship with Plaintiff ended. As described in greater detail below, Defendants Shea represented Levine in an effort to secure a recordable title and a promissory note on an office condominium which was purchased with monies ($70,000) loaned to Plaintiff by Levine. The owner of the office condominium – CMW Enterprises, LLC – ultimately defaulted under the terms of the mortgage and Defendants Shea thereafter represented Levine in foreclosure and eviction proceedings. In April 2007, Defendant George Shea ("Shea") appeared before a panel of the Michigan Attorney Discipline Board during a hearing held on Plaintiff's Petition for Reinstatement. Shea testified to his efforts in obtaining a mortgage and promissory note for his client and his dealings with Plaintiff in that regard.

Defendant Caren Burdi ("Burdi") is also an attorney in private practice. As described in great detail below, Burdi also represented Levine. In her representation of Levine, Burdi discovered suspected attorney misconduct by Plaintiff. Accordingly, Burdi filed a request for investigation with the Grievance Commission, and the Grievance Commission began the investigation which ultimately led to Plaintiff's suspension. Burdi testified at Plaintiff's disciplinary hearing. After the disciplinary hearing, Defendants Shea substituted for Burdi as counsel for Levine.

Defendants Jeffrey Vollmer ("Vollmer") and Wayne Wegner ("Wegner") are also attorneys in private practice. Vollmer is an associate at Defendant Wegner and Associates, P.C. (collectively,

- 4 -

"Defendants Wegner") and Wegner is the principal of that firm.  Apparently, Plaintiff owned a condominium in Northville, Michigan and was a member of the Highland Lakes Condominium Association.  In approximately October 2003, Plaintiff fell behind in her condo association dues and Defendants Wegner – representing the Association – instituted collection proceedings against Plaintiff.  As part of the collection efforts, Defendants Wegner pursued the Association's lien rights and requested full payment to avoid foreclosure proceedings.  Vollmer also testified at Plaintiff's reinstatement hearing before the Attorney Discipline Board.

### 2. *Plaintiff's Representation of Levine*

The underlying facts leading to Plaintiff's suspension from the practice of law are complex, however, they are set out in great detail in the November 6, 2002 Report and Order of the Michigan Attorney Discipline Board (the "Discipline Board") (Dkt. 29; Ex. 4).  To summarize, Plaintiff first met Levine in 1994 at a Dale Carnegie course both were attending as students.  *Id.* at 2.  This meeting led to Levine hiring Plaintiff to prepare a will for his father, Abraham Levine.  *Id.*  Levine's father passed away on March 7, 1997, and Levine then hired Plaintiff to file a probate estate for his father.  *Id.*  The major asset of Abraham Levine's estate was a condominium located in Bloomfield Hills, Michigan.  *Id.*

In the early morning hours of April 1, 1997, Levine suffered a heart attack.  *Id.* at 3.  Levine had been out to dinner at a Thai restaurant with Plaintiff the preceding evening and began to feel ill after returning home.  *Id.*  Defendant Levine eventually called for an ambulance and then telephoned Plaintiff to ask for her assistance.  *Id.*  Levine asked that Plaintiff help by "paying his bills" and arranging for the care of his pet dog.  *Id.*  Levine was hospitalized from April 1, 1997 to April 17, 1997; Levine underwent open heart surgery sometime between April 5 and 7, 1997.  *Id.*

- 5 -

During Levine's hospitalization, Plaintiff recommended that Levine execute a will and Power of Attorney.  *Id.* at 4.  To that end, Plaintiff prepared a General Durable Power of Attorney, which appointed Plaintiff as Levine's attorney-in-fact.  Plaintiff brought the document to the hospital, where it was executed by Defendant Levine on or about April 5, 1997.  *Id.*

Subsequently, using the power of attorney, Plaintiff signed several checks payable to herself from Levine's Comerica checking account.  *Id.*  The first check (#1015) was in the amount of $3,000, dated April 20, 1997, and contained a memo notation "for legal fees."  *Id.* at 5.  The second check (#1017), dated April 22, 1997, was for the sum of $4,620 and also noted to be "for legal fees."  Two smaller checks for expense reimbursements were also made payable to Plaintiff: check #1019 (4-23-97, $156.17); and check #1020 (5-1-97; $13.20).  *Id.*

In early June of 1997, Plaintiff asked Levine for a retainer of $5,000 for services concerning the estate of his father.  Levine paid the retainer by check #206, dated June 11, 1997.  *Id.*  On September 18, 1997, Levine wrote another check to Plaintiff in the amount of $7,000 (check #228).  *Id.*  Levine understood this amount to be a retainer for work related to the sale of his father's condominium.  *Id.*  The check contained the memo "for Retainer Real Estate."  *Id.* Plaintiff testified at her disciplinary hearing that the $7,000 "had nothing to do with the condominium."  *Id.*  This check for $7,000 brought the total amount paid to Plaintiff to $19,620 (plus separate cost reimbursements of $169.37).  *Id.*

During the course of her representation of Levine, Plaintiff sent several statements for services.  *Id.*  The first, dated July 28, 1997, was for $568.75.  *Id.*  A second statement dated August 4, 1997, was for the gross amount of $491.98.  *Id.*  A third statement, referenced "Personal," was not sent until April 21, 1998.  *Id.*  This statement reflected a gross billing of $4,375.  *Id.*  After

application of client funds presumably held in escrow, the statement indicated the "new balance of client funds" as a negative $1,348.75. *Id*. At 6.

The statement of April 21, 1998 for "personal" services was duplicated and resubmitted to Levine on June 28, 1998. Also, on June 28, 1998, another statement referenced "Estate of Abraham Levine" was prepared. *Id*. This statement covered the period 5/27/97 through 2/28/98, and requested payment of the sum of $7,809.17. *Id*. Between April 20, 1997 and September 18, 1997, Levine had actually paid to Plaintiff fees and costs totaling $19,789.37 for probate and "personal" services. *Id*. The Statement dated 6/28/98 requested an additional $7,809.17. *Id*.

Plaintiff did prepare the necessary form pleadings to commence the Estate of Abraham Levine. *Id*. These pleadings consisted of a Petition for Commencement of Proceedings (Independent Probate), Letters of Authority, Testimony of Interested Parties, Acceptance of Trust and Register's Order. *Id*. All of these documents were filed in the Oakland County Probate Court on July 30, 1997. *Id*. Thereafter, the probate estate was inactive until a Notice of Complaint and Omission was filed by the Court Clerk on October 1, 1998. *Id*. The authority of the Personal Representative (Levine) to act was to expire on October 30 and documentation had not been filed to close the estate. *Id*. Apparently, Plaintiff failed to respond to the Notice of Complaint and, on November 6, 1998, an Order was entered by the Court threatening to convert the estate from an unsupervised to supervised proceeding. *Id*.

### 3. *Personal Loan From Levine To Plaintiff*

In early to mid-1998, Plaintiff became interested in purchasing an office condominium in Canton, Michigan from which to operate her law practice. *Id*. at 7. Plaintiff asked Levine for a loan of $70,000 to purchase the office condominium. *Id*. Levine agreed to make the loan on terms

- 7 -

outlined in a letter dated July 1, 1998, from Plaintiff to Levine. *Id*. The loan was to carry interest at the rate of 7% per annum, require monthly payments based upon a 30-year amortization and be subject to a 10-year balloon payment in full. *Id*. The funds were advanced to Plaintiff by a First of America official check dated July 1,1998 in the amount of $70,000. Levine recalled giving Plaintiff the check on July 2, 1998. *Id*.

The check was deposited by Plaintiff on July 6, 1998 into a Comerica account in Plaintiff's name. *Id*. On September 16, 1998, the funds were transferred from Plaintiff's personal account to a second Comerica account in the name of "CMW Enterprises, LLC", which Plaintiff referred to as "an operating account for the building." *Id*.

Closing on the Canton office condominium, which Plaintiff expected "before July 15, 1998," never occurred. *Id*. According to Plaintiff the "seller breached and refused to close". *Id*. Plaintiff subsequently put a deposit on a second office condominium in the vicinity of the first. *Id*. The second purchase did close on or about October 13, 1998, the date on which Plaintiff transferred the loan proceeds by check to the title company responsible for the closing. *Id*. at 8.

Levine asserts he was unaware that the first office condominium transaction failed to close, and that a second unit had been purchased, until Plaintiff first informed him in December of 1998. *Id*. During this period no documentation memorializing the loan agreement had been prepared, other than the July 1, 1998 letter from Plaintiff. *Id*.

According to Levine, in approximately December of 1998, he received a telephone call from Plaintiff who informed him that she was in possession of a mortgage securing his loan of $70,000. *Id*. Plaintiff further stated that "there's something wrong with it" (*i.e.*, the mortgage) but that Levine shouldn't worry because Plaintiff would "take care of it." *Id*. In February of 1999, Levine recalled

receiving copies of a Mortgage Note and Mortgage signed by Plaintiff on February 6, 1999. *Id*. It was then that Levine discovered that "the terms were changed without [his] knowledge or understanding." *Id*. Specifically, the term of the note was extended to 15 years, and provided for a 90-day grace period for default in payment. *Id*.

A copy of a letter dated January 10, 1999 from Plaintiff to Levine was admitted into evidence at Plaintiff's disciplinary hearing. *Id*. The letter purported to confirm telephone conversations between Plaintiff and Levine during which Levine allegedly agreed to extend the note term to 15 years and the default period to 90 days. *Id*. Levine testified at Plaintiff's disciplinary hearing that he did not see this exhibit until "after the fact" and that "it was a lie." *Id*. at 9. Levine maintained that he never agreed to such changes in the terms of the mortgage. *Id*. Also, Levine's mortgage interest was never recorded. *Id*.

### 4. The Ann Arbor Condominium

In early 1999, Plaintiff told Levine that she recently visited an Ann Arbor condominium project and thought the purchase of a unit would be a "good deal." *Id*. According to Plaintiff, Levine immediately responded that he was interested and agreed to visit the property with her. *Id*. Levine had a very different recollection of the events surrounding his introduction to the Ann Arbor condominium. *Id*. In brief, Levine testified that Plaintiff heavily pressured and coerced him into investing in the Ann Arbor condominium deal. *Id*. In any event, Plaintiff and Levine traveled to Ann Arbor, where they inspected the property. *Id*. at 10. Plaintiff and Levine signed a purchase agreement that very day, with each paying one half of the $2,500 deposit. *Id*. It was their intention to be equal partners in the ownership of the condominium. Plaintiff would "manage" the property and locate a suitable tenant. *Id*.

- 9 -

Prior to entering into the condominium purchase agreement, Levine claimed he was not advised by Plaintiff to seek independent legal advice. *Id*. On March 8, 1999, approximately two weeks after signing the agreement, Plaintiff sent a letter to Levine acknowledging the possibility of a conflict of interest. *Id*. at 11.

Consistent with the requirements of the purchase agreement, a new mortgage had to be obtained for the Ann Arbor condominium purchase. Plaintiff completed a new mortgage application at Standard Federal Bank. *Id*. The application was completed in the name of Levine, only (*i.e.*, Levine being the only Borrower), but reflected that title to the property would be held in the names of both Levine and Plaintiff. *Id*. Plaintiff executed the loan application in the name of Levine using the Power of Attorney executed by Levine, during his hospitalization for cardiac surgery in April of 1997. *Id*. It also developed that Plaintiff decided to reside in the Ann Arbor condominium, rather than find another tenant. *Id*.

As a result of the information contained in the loan application and commitment, as well as the alleged "changes" made by Plaintiff in the earlier personal loan application, Levine became suspicious of Plaintiff. *Id*. Levine was also concerned that Plaintiff was unable to contribute one-half of the cost of condominium upgrades. *Id*. Levine was further surprised to see the mortgage commitment refer to a 7-year balloon obligation rather than a 30-year mortgage. *Id*. Consequently, at this point Levine decided to seek outside legal assistance. *Id*.

### 5. *Burdi Begins To Represent Levine*

In April of 1999, Levine contacted attorney Burdi to seek her advice with respect to both the "personal loan" documentation and the Ann Arbor condominium purchase. *Id*. at 12. On April 5, 1999, Plaintiff sent a letter to Levine, which, in part, acknowledged that "Attorney Karen Byrd" (sic)

had become involved. *Id*. The letter also confirmed that the Ann Arbor condominium mortgage application was based solely upon Levine's financial information, because Plaintiff was "not in a position to produce up-to-date income tax returns." *Id*.

Burdi telephoned Plaintiff and introduced herself as an attorney representing Levine. *Id*. After that introduction, Burdi testified at Plaintiff's disciplinary hearing that " ... the phone was silent for several moments, and she [Plaintiff] said, 'Don't blow this for me' .... " *Id*. Burdi then expressed her legal concerns regarding Plaintiff's use of a 2-year-old power of attorney to complete the loan application, and the anomaly that Plaintiff would not be liable on the mortgage but would be a legal title holder. *Id*. Burdi also communicated to Plaintiff her dissatisfaction with the personal loan documents (note and mortgage). *Id*.

Ultimately, the heated negotiations between Plaintiff and Burdi, on behalf of Levine, did not achieve resolution of the issues related to either the personal loan or the Ann Arbor condominium purchase. *Id*. No modified documents were ever executed by Plaintiff with respect to the "personal loan," nor was any mortgage or other lien recorded securing Levine's interest as lender on the Canton office condominium. *Id*.

Levine then became so upset with Plaintiff that he decided that he "didn't want anything to do with that [Ann Arbor] condo." *Id*. at 13. Burdi so informed Plaintiff and suggested that Plaintiff pursue the closing in Plaintiff's name, alone, or find another co-purchaser. *Id*. This was, apparently, unacceptable to Plaintiff, resulting in Burdi negotiating a release from the builder in exchange for a forfeiture of the deposit and upgrade payments (*i.e.*, approximately $17,000, of which Plaintiff had contributed $2,500). *Id*.

- 11 -

After informing Plaintiff that he was withdrawing from participation in the Ann Arbor condominium purchase, Levine asserted that Plaintiff did not react well. *Id*. Levine testified at Plaintiff's disciplinary hearing that "things got vicious." *Id*. On approximately May 10, 1999, Plaintiff began to call him "almost every day, sometimes twice a day." *Id*. Levine claimed Plaintiff was threatening legal action and subjecting him to verbal abuse. *Id*. In an effort to persuade Levine to continue with the Ann Arbor condominium purchase, Plaintiff told him to "be a man" and called him a "baby" and a "brat." *Id*. During one of these calls Plaintiff allegedly asserted that she really didn't need Levine to participate because "I don't need your signature; I have power of attorney." Plaintiff denied making such a statement. *Id*. The calls from Plaintiff purportedly continued over the next five days and included much "screaming and yelling." *Id*. Consequently, on May 15, 1999, during one of Plaintiff's calls, Levine "fired" Plaintiff stating: "I don't want you to represent me on anything." *Id.* at 14.

The calls from Plaintiff were made to Levine at both home and work, and both day and night. *Id*. Plaintiff spoke to Levine personally, but would also leave lengthy messages on his answering machine. *Id*. Levine recalls receiving "angry phone calls and messages" for more than a month. *Id*. Ultimately, Levine found it necessary to file a Petition for Personal Protection Order (P.P.O.) against Plaintiff. *Id*. The petition was filed in Oakland County Circuit Court and the P.P.O. issued on June 24, 1999. *Id*. Plaintiff filed a motion to dismiss the P.P.O., contesting the allegations, but Plaintiff's motion was denied and the P.P.O. allowed to stand. *Id*.

An answering machine tape recording of a series of telephone messages left by Plaintiff for Levine was admitted in evidence and played at Plaintiff's disciplinary hearing. *Id*. The call was made on a Saturday, and began with Plaintiff stating "I feel totally betrayed by you ... " *Id*.

Other excerpts included Plaintiff stating: "be a man," that Levine was "trying to screw" her; "I have a remedy against you;" that Levine has a "lack of ethics;" "I don't want any reminders of our relationship;" "you're getting sued by me;" and "I can get sanctions against you." *Id*.

During this same period of time, Burdi testified that she was receiving "four or five phone calls" per day from Plaintiff. *Id*. During these calls Plaintiff accused Burdi of "ruining her friendship with Levine," and costing everyone money. *Id*. Some of the telephone calls from Plaintiff were recorded on Burdi's answering service at "one in the morning, two in the morning." *Id*. If the voice mail recording cut her off in mid-message, Plaintiff simply called back and continued. *Id*. At times, Burdi's clients could not leave messages because her "voice mail was full" of Plaintiff's calls. *Id*.

### 6. The Discipline Board's Findings

In a November 6, 2002 Report and Order, the Discipline Board found that there was a preponderance of evidence establishing violations of multiple rules by Plaintiff in her representations of her clients, including Levine. *Id*. Specifically, with respect to the $70,000 loan from Levine to Plaintiff, the Discipline Board found that Plaintiff violated MRPC 1.4 (a)(b) [failure to keep a client reasonably informed]; 1.7(b) [conflict of interest]; 1.8(a) [business transaction with client; conflict]; 8.4(a)(c) [general violation of MRPC and conduct prejudicial to the administration of justice]. *Id*. The Discipline Board found, *inter alia*, that Plaintiff solicited and accepted a personal loan from Levine without first ensuring that the terms of the loan and security agreement were both settled and fully understood by her client, resulting in confusion and allowing Plaintiff to attempt to control — and even modify after the fact — the particulars of the loan and the mortgage security. *Id.*

- 13 -

On April 8, 2003, the Discipline Board issued a Report on Discipline and Order of Suspension and Restitution with Conditions, suspending Plaintiff from the practice of law for 18 months, effective April 30, 2003 (Dkt. 29; Ex. 3).  As a condition precedent to reinstatement, Plaintiff was required to "prepare or have prepared and execute a Promissory Note and Mortgage securing the $70,000 loan from Levine to [Plaintiff] in accordance with the terms of [Plaintiff's] letter dated July 1, 1998 (7% interest, payments based upon a 30-year amortization, a 10-year term with balloon payment, and an effective date of July 2, 1998, such that balloon payment of the entire balance must be paid on or before July 1, 2008)."  *Id.*

Plaintiff filed an application for leave to appeal the Discipline Board's decision with the Michigan Supreme Court, which was denied on July 29, 2004; Plaintiff then filed a motion for reconsideration, which was denied on November 22, 2004; Plaintiff filed a second application for leave to appeal, which was denied on December 29, 2004; and filed a second motion for reconsideration, which was denied on March 29, 2005.

### 7.  *Defendants Shea Begin Representing Levine*

Over the next three years, Defendants Shea, on behalf of their client Levine, attempted to secure a recordable mortgage and Mortgage Note from Plaintiff for the Canton office condominium. On April 4, 2006, a "Mortgage Note" and a "Form of Mortgage," which were prepared at the time, were executed by Plaintiff (Dkt. 29; Exs. 6 & 7).  Pursuant to the terms of the Mortgage Note, Plaintiff promised to pay Levine $70,000, together with interest from July 2, 1998 at the rate of 7% per annum.  *Id.*  The note had an effective date of July 2, 1998, with mortgage payments due on the 1st of each month beginning August 1, 1998.  Monthly payments were based on a 30-year

- 14 -

amortization with a 10-year balloon payment.  The Mortgage was recorded with the Wayne County Register of Deeds (Dkt. 29; Ex. 7).

### 8. *Plaintiff's Northville Condominium and Dealings with Defendants Wegner*

Plaintiff owned a condominium in Northville, Michigan and was a member of the Highland Lakes Condominium Association (the "Association").  *See Warren v. Highland Lakes Condo Ass'n,* 2008 WL 343472 *1 (Mich. App., Feb. 7, 2008).[3]   In October 2003, the Association's monthly assessments were increased and Plaintiff allegedly did not update her electronic payment system to reflect the new amount, which resulted in a shortage and late fees that went unpaid.  *See id.*  In June 2005, the Association's counsel – Defendant Wegner & Associates – began collection efforts for the unpaid assessments and late fees.  When full payment of the arrearage had not been made, Defendants Wegner pursued the Association's lien rights (in accordance with the bylaws) and requested full payment to avoid foreclosure proceedings.

On November 29, 2005, Plaintiff filed a 162-paragraph complaint against the Association, certain agents of the Association, and Defendants Wegner claiming breach of fiduciary duty, slander of title, abuse of process, violation of the Fair Housing Act and the Elliott-Larsen Civil Rights Act, and requested an accounting.  *See id.* at *2.  Shortly thereafter, Plaintiff filed Chapter 13 Bankruptcy protection, which caused the Association to stop foreclosure proceedings (the bankruptcy petition was dismissed a month later when Plaintiff failed to meet mandatory filing deadlines).  *See id*.

Meanwhile, the Association's counsel (not Defendants Wegner) submitted discovery requests to Plaintiff that included certain requests for admissions.  *See id.*  When Plaintiff failed to properly

---

[3]  The Court can take judicial notice of official court records.  *See Lynch v. Leis*, 382 F.3d 642, 647 n. 5 (6th Cir. 2004).

respond to the requests for admissions they were deemed admitted (following a hearing).  *See id* at
*3.  The defendants (the Association) then filed motions for summary disposition on the basis of the
deemed admissions and Plaintiff's failure to comply with discovery requests and orders.  *See id.*  The
trial court granted the motion for summary disposition based on the deemed admissions but denied
the defendants' request for costs in defending against Plaintiff's action.  *See id* at *4.

Shortly after the requests were deemed admitted, the Association sued to foreclose on the lien
against Plaintiff's Northville condo in a separate action.  *See id* at *3.  Plaintiff responded by filing
a counter-claim asserting many of the same claims that were raised in *her* lawsuit (which was
initially still pending).  After Plaintiff's lawsuit was dismissed with prejudice, the defendants filed
a motion for summary disposition on the Association's foreclosure claim and also on the Plaintiff's
counter claims (based on *res judicata*).  *See id*.  On November 3, 2006, a hearing was held after
which the trial court dismissed Plaintiff's counter claims with prejudice and granted summary
disposition on the foreclosure claim.  *See id* at *4.  The Wayne County Circuit Court awarded the
Association its unpaid fees/assessments of $9,624.15 and requested a further motion on the issue of
whether the Association was entitled to recover its attorney fees (to collect on the unpaid
assessments) under its bylaws and the applicable statutes.  *See id*.  A motion was filed.  *See id*.  A
hearing was held on November 17, 2006, at which time the trial court granted the Association's
motion for attorney fees awarding an additional $10,000, which was a little more than half of the
attorney fees that had been requested.  *See id*.

Plaintiff then appealed both the dismissal of her lawsuit and the dismissal of her
counterclaims in the foreclosure action.  She also appealed the award of attorney fees to the
Association in the foreclosure action.  The Association appealed only the award of less than the

actual attorney fees that they had incurred.  The Michigan Court of Appeals affirmed the trial court's decisions in both actions.  *See id.*

In its opinion, the Court of Appeals pointed out that the record demonstrated that Plaintiff "had a long history of failure to comply with discovery and had demonstrated a willingness to take any action that would delay the case or obscure the facts."  *Id.* at *4.  Furthermore, Plaintiff was frequently found to have "misstate[d] the facts in her arguments on appeal."  *Id.*

### 9. *Plaintiff's Reinstatement Efforts*

On or about April 28, 2006, Plaintiff filed a Petition for Reinstatement with the Discipline Board and a hearing was conducted on April 30, 2007.  During that hearing, Shea testified with respect to his efforts to facilitate the execution of a mortgage and promissory note (discussed above) and Plaintiff's conduct with respect to same.  Specifically, Shea testified that Plaintiff was both rude and unprofessional in her dealings with him (Dkt. 29; Ex. 5 at 5).  Vollmer also testified at Plaintiff's reinstatement hearing.  Vollmer testified that Plaintiff's legal filings in the trial proceedings relating to Plaintiff's Northville condominium (described above) were unduly lengthy, convoluted, and frivolous.  *See id.* at 6.

On September 6, 2007, the Discipline Board denied Plaintiff's Petition for Reinstatement. Plaintiff thereafter sought review of that order.  On September 30, 2008, the Discipline Board issued an Opinion with respect to Plaintiff's request for review of the panel's September 6, 2007 order denying her petition for reinstatement.  The Discipline Board found that Plaintiff's conduct was "frivolous, unfocused, unprofessional, and showed a complete lack of respect for the legal profession and its workings" (Dkt. 29; Ex. 5).  The panel also noted that "the numerous lengthy pleadings ... , emails, and other documents authored by [Plaintiff] during the period of suspension reflect a person

- 17 -

who appears obsessed with what she views as some sort of 'betrayal' by Levine, in concert with Burdi, and who is simply unable to deal with legal or even financial matters in a reasonable and appropriately dispassionate matter [sic]." *Id* at 3. The panel therefore recommended that Plaintiff's request for reinstatement be denied; and the Discipline Board agreed (Dkt. 29; Ex. 5).

### 10. Foreclosure Proceedings Against Canton Office and Wayne County Lawsuit

On November 7, 2008, Defendants Shea, on behalf of their client, Levine, instituted foreclosure proceedings on the Canton office condominium. In response, Plaintiff and CMW Enterprises, LLC filed a lawsuit against Defendants Shea and Levine in the Wayne County Circuit Court (Dkt. 29, Ex. 8).

Many of the alleged factual bases for the claims made by Plaintiff against Defendants Shea in the instant action, (*i.e.*, those related to Defendants Shea's actions in securing Levine's interest in the subject office condominium and Shea's testimony at the Reinstatement Hearing) were raised by Plaintiff in the Wayne County Circuit Court action. Plaintiff agreed to entry of an Order of Dismissal, without prejudice, of the Wayne County Circuit Court Action following a motion hearing on February 6, 2009 (Dkt. 29, Ex. 9).

On March 21, 2009, a Notice was posted at the Canton office condominium at issue that there was a default on the mortgage made by CMW Enterprises, LLC, to Levine and, under the terms of the mortgage and pursuant to Michigan statute, notice was being given that the mortgage would be foreclosed by sale of the premises on April 29, 2009 at 1:00 p.m. at the Wayne County Circuit Court (Dkt. 29; Ex. 10).

The Sheriff's sale went forward and Levine purchased the property for $68,844.37. The redemption period expired on October 29, 2009, six months from the date of the Sheriff's sale. Defendants Shea, on behalf of Levine, thereafter instituted eviction proceedings in the 35th Judicial District Court of Michigan. On December 22, 2009, an Order of Eviction was entered, awarding possession of the Canton condominium to Levine (Dkt. 29; Ex. 2).

On or about October 26, 2009, Plaintiff filed an "emergency motion" in the then-dismissed Wayne County Circuit Court action seeking to: (1) rescind the Sheriff's sale; (2) reopen the proofs; (3) stay any decisions pending the outcome of "other proceedings;" and (4) for an escrow to allow for payment of "expenses" without risk of foreclosure. Plaintiff's motion was denied (Dkt. 29; Ex. 11).

### 11. Plaintiff's Complaint in the Present Case

Plaintiff's Complaint in this case consists of eighty-five numbered paragraphs (Dkt. 2; Complaint). The first fifty-eight paragraphs consist of "common allegations," discussing the factual background of Plaintiff's grievance hearings and her dealings with the various Defendants. The remaining paragraphs (¶¶ 59-85) allege three counts: (Count I) Fourteenth Amendment Violations; (Count II) Fifth Amendment Violations; and (Count III) Eighth Amendment Violations. *See id.* Plaintiff's three counts refer almost exclusively to the conduct of Vella and refer only obliquely to the conduct of the remaining Defendants.

For instance, Count I alleges, generally, that Vella targeted Plaintiff for wrongful prosecution because of her gender and that Vella possesses "an extreme hatred of women" (Dkt. 2; ¶¶ 62-63). Plaintiff further alleges in Count I that Vella participated with "five witnesses (of which four are

- 19 -

licensed attorneys) to frame [Plaintiff] at all phases of the [grievance] process with testimony that he knew to be false." *Id.* ¶ 64.

In Count II, Plaintiff alleges that, in violation of her Fifth Amendment rights against "double jeopardy," a request for investigation that Plaintiff filed against Vella was wrongfully dismissed. *Id.* ¶¶ 71-72. Plaintiff further alleges that Michigan's "discipline system is unconstitutional because there is not right to judicial review of constitutional claims. Constitutional claims may only be reviewed by justices of the Michigan Supreme Court...yet, the [Michigan Supreme Court] rarely accepts an appeal for review from a decision of the Attorney Discipline Board." *Id.* ¶ 74. Plaintiff further alleges that she has been injured "as a direct result of being framed and losing her license to practice law." *Id.* ¶ 77.

In Count III, Plaintiff alleges, somewhat cryptically, that her Eighth Amendment rights against being subjected to "cruel and unusual punishment" were violated due to the conduct of Vella. Specifically, Plaintiff alleges that Vella violated her constitutional rights by facilitating a "foreclosure of [Plaintiff's] properties by eliciting and concealing perjured testimony and otherwise retaliating to destroy her life...". *Id.* ¶ 82.

## II.  ANALYSIS

### A.  Legal Standards

#### 1.  *Motions to Dismiss Pursuant to Rule 12(b)(6)*

Defendants seek to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle [her] to relief." *In Re DeLorean*

- 20 -

*Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993).  Furthermore, "the complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 468 (6th Cir. 2005).  Finally, for a complaint to withstand a motion to dismiss, the complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### 2.  *Motions for Summary Judgment Pursuant to Rule 56*

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When evaluating a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.  Rather, the evidence should be viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, the facts and any inferences that can be drawn from those facts [ ] must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 373 (6th Cir. 2009) (quotation marks omitted).

### 3.  *Motions for Sanctions Pursuant to Rule 11*

Rule 11 permits a district court to impose sanctions against an attorney or unrepresented party who has filed and signed a pleading or motion "if the court concludes that it was filed for any improper purpose and it has no basis in law or fact." *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 778 (6th Cir. 1996) (citing *Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 541-46 (1991)).   Under Rule 11, an attorney or unrepresented party has an obligation "'to

conduct a reasonable inquiry ino the law and facts before signing pleadings, written motions and other documents.'  If an attorney fails to meet this obligation . . . [s]he is subject to sanctions sufficient to meet the deterrent goals of Rule 11." *Rentz v. Dynasty Apparel Indus, Inc.*, 556 F.3d 389, 401 (6th Cir. 2009) (quoting Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendments).  Further, while Rule 11 "is not intended to be a compensatory mechanism in the first instance, it is equally clear that effective deterrence sometimes requires compensating the victim for attorney fees arising from abusive litigation." *Id.* at 400.  *Pro se* litigants must comply with Rule 11 no less than attorneys, and must make a reasonable inquiry as to whether the pleading in question is well-grounded in fact and warranted by existing law.  *See Danvers v. Danvers*, 959 F.2d 601, 604-605 (6th Cir. 1992).

## B.  Lack of Subject Matter Jurisdiction Under *Rooker-Feldman*

Defendants' challenge under the *Rooker-Feldman* doctrine must be addressed first, as it implicates the Court's subject matter jurisdiction. *See In Re Cook*, 551 F.3d 542, 548 (6th Cir. 2009). The *Rooker-Feldman* doctrine[4] holds that district courts lack subject matter jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp*., 544 U.S. 280, 284 (2005). "[T]he pertinent inquiry ... is whether the 'source of the injury' upon which plaintiff bases his federal claim is the state court judgment." *Lawrence v. Welch*, 531 F.3d 364, 368 (6th Cir. 2008) (quoting *McCormick v. Braverman*, 451 F.3d 382, 394-95 (6th Cir. 2006)).  "If there is some other source of

---

[4] The *Rooker-Feldman* doctrine takes it name from two Supreme Court cases – *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

injury, such as a third party's actions, then the plaintiff asserts an independent claim." *McCormick*, 451 F.3d at 393.

Recently, the Supreme Court, after noting that the *Rooker-Feldman* doctrine has been "[v]ariously interpreted in the lower courts," endeavored to clarify the doctrine's contours. *Exxon Mobil Corp., v. Saudi Basic Indus. Corp*., 544 U.S. 280 (2005). The Court held that the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 281.

In *Exxon Mobil*, two subsidiaries of ExxonMobil formed joint ventures with Saudi Basic Industries Corporation (SABIC) to produce polyethylene in Saudi Arabia. *Id.* The parties eventually "began to dispute royalties that SABIC had charged the joint ventures for sublicenses to a polyethylene manufacturing method." *Id.* In July 2000, SABIC preemptively sued ExxonMobil in Delaware state court seeking a declaratory judgment that the royalty charges were proper. *Id.* "About two weeks later, ExxonMobil ... countersued SABIC in the United States District Court for the District of New Jersey ...." *Id.* In January 2002, ExxonMobil "answered SABIC's state-court complaint, asserting as counterclaims the same claims ... [it] had made in the federal suit in New Jersey. The state suit went to trial in March 2003, and the jury returned a verdict of over $400 million in favor of [ExxonMobil]." *Id.*

Before the Delaware suit went to trial, SABIC moved to dismiss the federal suit. *Id.* "The Federal District Court denied SABIC's motion to dismiss. SABIC took an interlocutory appeal, and the Court of Appeals heard argument in December 2003, over eight months after the state-court jury

- 23 -

verdict." *Id.* Although ExxonMobil filed its federal complaint before the state-court trial reached judgment, the Court of Appeals held that "[t]he only relevant consideration ... 'is whether the state judgment precedes a federal judgment on the same claims.'" *Id.* (quoting *Exxon Mobil v. Saudi Basic Indus. Corp.*, 364 F.3d 102, 105 (3rd Cir. 2004)). The Court of Appeals held that "[o]nce ExxonMobil's claims had been litigated to a judgment in state court, ... *Rooker Feldman* 'preclude[d][the] federal district court from proceeding.'" *Id.* at 290 (quoting *Exxon Mobil*, 364 F.3d at 104).

The Supreme Court unanimously disagreed with this holding, noting that "[w]hen there is parallel state and federal litigation, *Rooker-Feldman* is not triggered simply by the entry of judgment in state court." *Id.* "[N]either *Rooker* nor *Feldman*," the Supreme Court concluded, "supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains sub judice in a federal court."

The *Exxon Mobil* Court explained that *Rooker-Feldman* "recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court-judgments, which Congress has reserved to this [the Supreme] Court." 544 U.S. at 292. *Exxon Mobil* thus distinguished between parallel state court proceedings where the federal and state suit were filed nearly contemporaneously with each other (explaining that subject matter jurisdiction does not magically disappear if the state court should reach a decision before the federal parallel proceeding) and cases where a party is seeking a *de facto* appeal of a state court proceeding. Here, it is clearly the latter situation.

The state grievance proceedings were clearly judicial in nature. There is no dispute that the proceedings undertaken by the Grievance Commission were adversarial, with the ultimate question

being whether Plaintiff violated the Michigan Rules of Professional Conduct.  Thus, it clearly involved a determination of liabilities based on facts and law existing at the time.  *See Fieger* v. *Thomas,* 74 F .3d 740, 744 (6th Cir. 1996) (citing *Prentis,* 211 U.S. at 226).  Furthermore, this process involves the ability to seek leave to appeal to the Michigan Supreme Court (*See* MCR 9.122(a), and MCR 7.302).  Indeed, Plaintiff filed an application for leave to appeal with the Michigan Supreme Court, which was denied on July 29, 2004; a motion for reconsideration, which was denied on November 22, 2004; a second application for leave to appeal, which was denied on December 29, 2004; and a second motion for reconsideration, which was denied on March 29, 2005. MCR 7.302 requires the party seeking leave to appeal to set forth, among other things: "(b) the questions presented for review related in concise terms to the facts of the case; ... (d) a concise statement of the material proceedings and facts . . . and (e) a concise argument ... in support of the appellate's position on each of the stated questions."  In her applications for leave to appeal Plaintiff presumably complied with these requirements, which gave the Michigan Supreme Court an opportunity to consider whether or not the issues involved warranted review.

While it is true that a full review of Plaintiff's case was not given by the Michigan Supreme Court, the grievance process, nevertheless, permits an appellant to seek leave to appeal to the Michigan Supreme Court and, in the undersigned's opinion, a decision by the Michigan Supreme Court denying leave constitutes judicial review sufficient to satisfy any constitutional requirement of a judicial review.  Indeed, the United States Supreme Court has not mandated that an appeal in an attorney discipline proceeding be as of right.  *See, e.g., Fieger,* 74 F.3d at 748 (analyzing *Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423 (1982)).   Further, the fact that review was discretionary did not bar presentation of Plaintiff's federal claims - Plaintiff

- 25 -

was permitted to raise such claims in her motion for leave.  *Fieger,* 74 F.3d at 749 (citing *Hirsh* v.

*Justices of the Supreme Court of Cal.,* 67 F.3d 708, 713 (9th Cir. 1995)).  The decision by the

Michigan Supreme Court is a "final judgment," reviewable by the United States Supreme Court

under § 1257.  *See Richardson* v. *District of Columbia Court of Appeals,* 83 F.3d 1513, 1514 (D.C.

Cir. 1996) (citing *Local No.* 438 *Constr.* & *Gen. Labor Union, AFL-CIO* v. *Curry,* 371 U.S. 542,

549 (1963)).

In sum, Plaintiff's claims of constitutional violations in this case amount to accusations that

Defendants' testimony and arguments before the Discipline Board were false, and that the acceptance

of those arguments by the Discipline Board wronged her.  Indeed, Plaintiff's Complaint alleges in

no uncertain terms that she has been injured "**as a direct result of being framed and losing her law**

**license**" (Dkt. 2, ¶ 77) (emphasis added).  Clearly, the allegations of Plaintiff's Complaint launch a

direct attack on the validity of the Discipline Board's decision to suspend her law license.  Such

review amounts to appellate review of a state-court decision to suspend Plaintiff's law license.  For

this Court to eventually conclude that Defendants' actions were captured by § 1983, it would have

to "evaluate state court judgments to determine if they violated ... constitutional rights," which

*Rooker-Feldman* prohibits.  *See Patmon v. Michigan Supreme Court*, 224 F.3d 504 (6th Cir. 2000).

Indeed, the undersigned finds *Patmon* directly applicable to this case.  In *Patmon*, the Sixth

Circuit held that a Michigan Supreme Court order that denied a suspended attorney's motion for

leave to appeal from suspension by Disciplinary Board, was a judicial decision on the merits, and

thus was a final judgment or decree by Michigan's highest court.  As such, federal review could only

be obtained through petition for writ of certiorari to the United States Supreme Court, and the district

court lacked jurisdiction, pursuant to *Rooker-Feldman* doctrine.  Plaintiff's claims in this case, as in

*Patmon*, appear to fall within the limited class of cases that *Rooker-Feldman* bars.  As such, the undersigned concludes that this Court does not have subject matter jurisdiction over Plaintiff's claims.

### C. Immunity

Even assuming, *arguendo*, that the Court found that subject matter jurisdiction existed, Defendants are entitled to immunity on various grounds.

"The Eleventh Amendment is an explicit limitation of the judicial power of the United States." *Missouri* v. *Fiske,* 290 U.S. 18, 25 (1933).  The Eleventh Amendment to the United States Constitution states: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign state."  U.S. CONST. amend. XI.  In the absence of consent, a suit in which the State or one of its departments or agencies is named as a defendant is proscribed by the Eleventh Amendment.  *See Pennhurst State Sch.* & *Hosp.* v. *Halderman,* 465 U.S. 89, 100 (1984).

The Michigan Supreme Court is an agency of the State of Michigan, and has the state constitutional authority to regulate all matters pertaining to the practice of law in Michigan. Mich. Const. art. 6, § 5. *See Grievance Administrator v. Deutch*, 455 Mich. 149 (1997). This constitutional empowerment is codified by the legislature:

> The supreme court has the power to provide for the organization, government, and membership of the state bar of Michigan, and to adopt rules and regulations concerning the conduct and activities of the state bar of Michigan and its members, the schedule of membership dues therein, and the discipline, suspension and disbarment of its members for misconduct, and the investigation and examination of applicants for admission to the bar.

MCL § 600.904.

Under its authority, the Michigan Supreme Court promulgated rules governing the discipline of Michigan attorneys. *See* MCR § 9.100, *et seq* . The Michigan Supreme Court created a prosecution arm known as the Michigan Attorney Grievance Commission. *See* MCR § 9.108. It also created an adjudicative arm known as the Michigan Attorney Discipline Board. *See* MCR § 9.110. Both are subject to the rules and procedures adopted by the Michigan Supreme Court. The decisions of both are subject to the Michigan Supreme Court's review. As a result, the disciplinary suspension of Plaintiff's license is the functional equivalent of a state court judgment.

The Michigan Supreme Court is immune from suit for both injunctive and monetary relief pursuant to the Eleventh Amendment. *See Alia* v. *Michigan Supreme Court* 906 F .2d 1100 (6th Cir. 1990); *see also Abick v. State of Michigan,* 803 F.2d 874 (6th Cir. 1986). The Michigan Supreme Court possesses inherent power to regulate the Bar. *See Johnson* v. *DiGiovanni,* 347 Mich. 118, 127 (1956). Since the Grievance Commission acts as an "arm" of the Michigan Supreme Court, it is also entitled to Eleventh Amendment immunity in discharging its "constitutional responsibility" to supervise and discipline attorneys. *See* MCR § 9.108(A); *see also Patmon* v. *Thomas,* 1997 WL 299377, at *1 (6th Cir. June 4, 1997); *see also Mosby v. Ligon*, 418 F.3d 927 (8th Cir. 2005); *Butcher v. Michigan Supreme Court*, 2008 WL 2067028 (E.D. Mich. 2008). As such, Plaintiff's suit against the Grievance Commission is barred by the Eleventh Amendment.

Plaintiff seeks monetary damages of all Defendants (*see* Compl. at 15).[5] "[A] State is not a 'person' against whom a § 1983 claim for money damages might be asserted." *Lapides v. Board of*

---

[5]   Indeed, Plaintiff's prayer for relief requests "that this court enter judgment against Defendants in an amount consistent with the damages sustained in addition to attorney fees...costs and punitive damages." *See id*. Plaintiff does not request injunctive relief against any Defendant.

*Regents*, 535 U.S. 613, 617 (2002).  This same rule applies to state agencies and officials acting in their official capacity.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  While it is settled law that "[a] state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State'" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n. 10 (1989), Plaintiff does not request injunctive relief against any Defendant.  Thus, Plaintiff's claims against the individual state Defendants (Agacinski and Vella) are also barred.

Furthermore, recognizing the importance of the disciplinary process to the judiciary, courts have afforded very broad immunity to members of bar grievance committees and their staff.  *See Bishop v. State Bar of Texas*, 791 F.2d 435 (5th Cir. 1986)(citing cases); *see also Simons v. Bellinger*, 643 F.2d 774 (D.C. Cir. 1980)(grievance committee members entitled to absolute immunity in exercising inherent judicial power in determining compliance with laws and rules governing practice of law); *Thaler v. Casella*, 960 F.Supp. 691 (S.D.N.Y. 1997)(same).

Finally, all Defendants are also entitled to absolutely immune from Plaintiff's claims by virtue of MCR 9.125, which provides:

> A person is absolutely immune from suit for statements and communications transmitted solely to the administrator, the commission, or the commission staff, or given in an investigation or proceeding on alleged misconduct or reinstatement.  The administrator, legal counsel, investigators, members of hearing panels, the commission, the board, and their staffs are absolutely immune from suit for conduct arising out of the performance of their duties.

Again, Defendants are accused of violating Plaintiff's civil rights in their acts or omissions as officials of the Grievance Commission and/or for statements they made during Plaintiff's disciplinary

proceedings. Defendants were acting within their statutory powers and statutory duties as set forth in the Michigan Court Rules. *See* MCR 9.109(A) and 9.110(D). Therefore, the undersigned finds that Defendants are also immune from liability for their official actions in the investigation and prosecution of Plaintiff under MCR 9.125. *See Eston v. Van Bolt*, 728 F.Supp. 1336 (E.D. Mich. 1990).

### D. SANCTIONS

Defendants Wegner, Levine and Burdi each filed motions requesting sanctions against Plaintiff under Fed. R. Civ. P. 11. Rule 11(b) provides that an attorney or unrepresented person who submits a pleading to the court, "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery;
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b)(1)-(4). Rule 11(b) also "imposes on litigants a continuing duty of candor, and a litigant may be sanctioned for continuing to insist upon a position that is no longer tenable." *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 395 (6th Cir. 2009) (internal quotation marks and citation omitted).

- 30 -

Rule 11(c)(2) contains a "safe harbor" provision. It provides that the party seeking sanctions must serve the motion for sanctions under Rule 5 on the opposing party "but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention or denial is withdrawn or appropriately corrected within 21 days after service...." Defendants Wegner and Levine have satisfied Rule 11's safe harbor provision (Dkt. 43, Ex. 2; Dkt. 64, p. 5). Burdi's Rule 11 motion does not indicate that it was served upon Plaintiff 21 days before being filed. Thus, Defendants Wegner and Levine's motions for Rule 11 sanctions are properly before the Court, but Burdi's is not. Accordingly, Burdi's motion for sanctions should be denied.

If a court determines that Rule 11(b) has been violated, it may impose monetary sanctions on the attorney responsible for the violation. *See Rentz, supra* (quoting Fed. R. Civ. P. 11(c)(4) ("Rule 11 expressly provides that 'if imposed on motion and warranted for effective deterrence,' sanctions may include 'an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.'"). The test for imposing Rule 11 sanctions "is whether the attorney's conduct was objectively unreasonable under the circumstances." *Nieves v. City of Cleveland*, 153 F. App'x 349, 352 (6th Cir. 2005). This objective standard is "intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." *Id.* at 353. As the Sixth Circuit observed in *Nieves*, the district court has broad discretion on the issue of Rule 11 sanctions. "Because the district court knows best how to regulate its forum, it has broad discretion in determining when a sanction is warranted and what sanction is appropriate." *Id.*

Upon careful review of the record and the existing case law, the undersigned agrees with Defendants Wegner and Levine that there is little legal support for Plaintiff's claims. Plaintiff should

have been aware that her claims were not warranted by existing law. Moreover, Plaintiff failed to provide arguments that she had a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law that would save the claims asserted in Plaintiff's complaint. Accordingly, the undersigned finds that sanctions are warranted under Rule 11(b).

Indeed, during the hearing on the various motions in this case, the undersigned ordered Plaintiff to file a supplemental brief addressing two specific legal issues – (1) the *Rooker-Feldman* doctrine and; (2) immunity. The undersigned cautioned Plaintiff that her arguments on these two issues were not compelling and gave Plaintiff a final opportunity to convince the Court that her arguments were not frivolous or else she should agree to voluntarily dismiss her claims. Plaintiff did not agree to voluntarily dismiss her claims, but rather filed her supplemental brief. Plaintiff's supplemental brief fails to adequately address the undersigned's concerns.

As to immunity, Plaintiff's supplemental brief exclusively discusses prosecutorial immunity. Indeed, when a prosecutor performs "advocative" conduct, that is, he "act[s] within the scope of his duties in initiating and pursuing a criminal prosecution," *Imbler v. Pachtman*, 424 U. S. 409, 410 (1976), he or she is absolutely immune from suit. Plaintiff suggests that this immunity is not as absolute as it once was, based on the Eighth Circuit case *McGhee v. Pottawattamie County, Iowa*, 547 F.3d 922 (8th Cir. 2008). Indeed, *McGhee* recognized immunity would not extend to a prosecutor "who violated a person's substantive due process rights by obtaining, manufacturing, coercing and fabricating evidence before filing formal charges, because this is not 'a distinctly prosecutorial function.'" *Id.* at 933. *McGhee* was argued in the United States Supreme Court, however the case settled prior to any decision by the Supreme Court. In any event, the undersigned does not find *McGhee* applicable to the present case. First, Plaintiff does not appear to allege that

- 32 -

Vella violated her rights before filing formal charges.  Rather, Plaintiff's allegations against Vella appear to relate solely to Vella's actions and conduct during Plaintiff's disciplinary hearing.  Second, *McGhee* is not a Sixth Circuit decision, and thus is not binding on this Court.  Finally, and most importantly, Plaintiff's supplemental brief fails to directly address the Eleventh Amendment and MCR 9.125, which grants absolutely immunity to grievance commission staff – and witnesses – for actions taken during the prosecution of an attorney grievance.

Turning to *Rooker-Feldman*, the sole authority cited by Plaintiff is a Duke Law Journal Article – *The Rooker-Feldman Doctrine: What Does It Mean To Be Inextricably Intertwined?*,  56 Duke L.J. 643 (2006).  Plaintiff's supplemental brief does not cite a single case – much less a Sixth Circuit case – regarding the applicability of *Rooker-Feldman* to this matter.  Indeed, the undersigned found that the recent Sixth Circuit case of  *Patmon v. Michigan Supreme Court*, 224 F.3d 504 (6th Cir. 2000) is directly applicable to this case and squarely holds that this Court does not have subject matter jurisdiction over Plaintiff's claims.  Simply put, Plaintiff's supplemental brief on the issue of sanctions (Dkt. 75) utterly fails to convince the undersigned that Plaintiff's arguments regarding *Rooker-Feldman* are warranted by existing Sixth Circuit law and/or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.

Plaintiff's claims in this case suffer from numerous other defects.  For instance, Plaintiff's Count III (Eighth Amendment violations) is clearly inapplicable, as it is well settled that the Eighth Amendment prohibition against cruel and unusual punishment is applicable only to those convicted of crimes.  *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1977); *Ingraham v. Wright*, 430 U.S. 651, 664 (1977); *Roberts v. City of Troy*, 773 F.2d 720, 722-23 (6th Cir. 1985).  It is clear to the undersigned that Plaintiff did not conduct a reasonable inquiry into the law before filing this action,

much less after being presented with authority clearing showing that her claims were no longer tenable.

In any event, the undersigned recommends that Defendants Wegner and Levine's motions for sanctions (Dkts. 43 and 64) be granted. The undersigned suggests that an appropriate sanction against Plaintiff might be to require her to pay to Defendants Wegner and Levine some or all of the attorney fees and costs they reasonably incurred in defending this action. Should this Report and Recommendation be adopted, Defendants Wegner and Levine should be required to submit to the Court an accounting of the costs and reasonable attorney fees they incurred in defending this action, and Plaintiff should then be permitted time to file objections, if any, to these Defendants' calculations. The Court can then determine an appropriate monetary sanction against Plaintiff to deter repetition of her conduct in this lawsuit.

### III. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Defendant Michael Levine's Motion for a More Definite Statement (Dkt. 19) be **DENIED**, as moot, that all Defendants' Motions to Dismiss/Motions for Summary Judgment (Dkts. 25, 29, 32, 48 & 53) be **GRANTED,** that Defendants Wegner and Levine's Motions for Sanctions (Dkts. 43 & 64) be **GRANTED** and that Defendant Burdi's Motion for Sanctions (Dkt. 47) be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).

- 34 -

The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon_____
Mark A. Randon
United States Magistrate Judge

Dated:  January 26, 2011

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 26, 2011.

s/Melody R. Miles_____
Case Manager to Magistrate Judge Mark A. Randon
(313) 234-5542

Copy mailed to:
*Cheryl M. Warren*
*143 Cady Centre, #258*
*Northville, MI 48167*